436

Argued and submitted October 30, 2006, affirmed May 2, 2007

In the Matter of the Marriage of

Patricia Kay DEBOER,
aka Patricia Kay Ward,
*Petitioner-Respondent,*
*and*

Ralph William DEBOER,
*Respondent-Appellant.*

Morrow County Circuit Court
93CV082; A129450

157 P3d 1279

Steve P. Chez argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Wollheim, Judge.

WOLLHEIM, J.

---

* Brewer, C. J., *vice* Ceniceros, S. J.

## WOLLHEIM, J.

Husband appeals the trial court's supplemental judgment modifying a judgment of dissolution of marriage by increasing wife's award of spousal support and making the award of spousal support indefinite, ORS 107.135. On *de novo* review, we find that wife has shown a substantial and unanticipated change in circumstances, and affirm. *See Vandenberg and Vandenberg,* 186 Or App 592, 594, 64 P3d 1185 (2003).

Deferring to the trial court's express and implied findings of credibility, *Tomos and Tomos,* 165 Or App 82, 87, 995 P2d 576 (2000), we accept the trial court's assessment of the parties' and witnesses' demeanors.[1]

The parties were married in 1975 and divorced by stipulated judgment in 1995. Pursuant to that judgment, wife was awarded spousal support in the sum of $600 per month for 10 years. The purpose of the spousal support was not stated in the judgment and no transcript of a dissolution hearing, if any, was submitted for the record.

Wife left school before completing high school or receiving a general equivalency diploma (GED) to marry husband and raise their children. Wife attempted to earn her GED while married; however, she was not successful and, to date, has not received either a GED or a high school diploma.

During their marriage, wife held sporadic employment, working temporarily as a nurse assistant and as a line worker in a potato processing plant. She left her line worker position to be a "stay-at-home mom" and homemaker. The trial court found that wife's lack of education and poor work history during the marriage was attributed to the fact that

"[t]here was no reason, during the marriage, for [wife] to seek further education because it was contemplated [by

---

[1] We note that, from the time of dissolution in 1995 to the 2005 modification proceeding, the same trial judge has presided over this case. The trial court implicitly found wife and her witnesses credible; although husband testified in contradiction to much of wife's testimony, we do not disturb the trial court's findings of fact and determination of credibility without reason to do so. *Kempke and Kempke,* 151 Or App 434, 440, 949 P2d 1239 (1997).

both parties] that she would be a traditional homemaker and [that husband] would be the primary breadwinner. [Husband] actually wanted her not to work due to the fact that, with his relatively high income, [her job] would put them in a higher tax bracket."

After the parties' separation, a vocational consultant conducted educational tests on wife for vocational evaluation. He found that wife exhibited a sixth-grade reading ability, a fourth-grade spelling ability, and a fifth-grade arithmetic ability. In a General Aptitude Test Battery, wife's scores placed her in the lowest 10 percent of the population. However, the consultant noted that, despite wife's limited work history, he felt that she could "successfully maintain gainful employment." At the time of the dissolution, the vocational consultant concluded:

*"Although [wife] is capable of gainful employment, she does have a substantial hindrance to employment in that she is educationally limited.* Through her demonstrated work history and subsequent vocational testing, [wife] is currently operating at the sixth grade level. She also has difficulty with comprehension and the ability to perform multiple functions at the same time. [Wife] will be limited in the extent to which she is able to perform as a result of her eighth grade education and lack of exposure to further education through her adult life. She also shows a poor work history. This extremely limits the scope of [wife's] employment opportunities. [*She*] *is physically capable of performing work in the light to medium work range, which is required in most occupations.* However, without extensive training and educational skills upgrading, [wife] will be forced to resort to menial labor-oriented positions. It is my opinion that [wife] would require a specific vocational preparation time of 12 months to be able to adequately perform a position to an employer's satisfaction. In addition, should she wish to broaden her scope of available employment opportunities, she would be required to return to an educational environment and obtain a GED certificate. It is my estimate, based upon knowledge of [wife] and [the] information gathered, that it would take her approximately 12 months to attain the GED."

(Emphasis added.)

The consultant also listed several positions within wife's vocational and educational range, including "fast foods worker," "hotel desk clerk," "telephone answering services operator," "sorter, agricultural produce," "home attendant," "laundry worker," and "nurse assistant." Based on wife's knowledge, skills, and abilities and her geographic area, the consultant projected that wife could "expect to earn a gross annual income of $6,669" for a part-time position and $9,880 for a full-time position.

To achieve those goals, the consultant recommended that wife enter an educational program and obtain her GED to "acquaint[ herself] with various educational opportunities" and "enhance her employability." Such opportunities included training for "keyboarding, computers, and general office skills such as filing, typing, and [using] business machines" plus "upgrad[ing] her spelling and vocabulary," to allow wife to "compete for higher-paying employment opportunities, which are currently not available to her given her knowledge, skills, and abilities."

Just prior to the dissolution in 1994, wife worked two part-time jobs: one as a dishwasher and cook's assistant and the other as a general housekeeper caring for various elderly women. The housekeeping position continued for approximately six years. When those jobs ended, wife attempted to find similar work, but severe back and hip pain caused by foot problems hindered her employment search.[2]

In 1997, because of her foot problems, wife consulted with a podiatrist, Dr. Carlson, and commenced treatment for her pain. Carlson testified that wife suffered from a severe case of plantar fasciitis, an inflammation of the ligament at the bottom of the foot that was causing her heel pain, and that wife's extremely high-arched foot made her more susceptible to developing such a condition. The condition caused pain and tightness in her feet that were present throughout

---

[2] As of April 2004, wife was still employed as a housekeeper working two hours a week. However, at the time of the May 2005 spousal support modification hearing, wife testified that she had been unable to work and had received no income for approximately the previous 12 months.

the day and forced wife to limit her physical activities; specifically, the amount of time spent standing and walking. Activities that could aggravate such a condition varied from "simple walking and standing" to "running or adding any extra weight [on her feet] or stretching, [or] climbing a ladder * * *."

The regimen for treatment of plantar fasciitis varies from patient to patient, with surgery being the most drastic treatment. Because wife's plantar fasciitis was particularly severe due to her high-arched foot, Carlson had "shied" away from speaking with her regarding surgery, because he felt that wife's chance for full recovery after surgery was "a lot less than another person." Also, wife's particular condition and lack of income limited her treatment options:

> "[WIFE'S COUNSEL]: Has [wife] been able to do anything that helped with the pain during the course of the last several years?
>
> "[DR. CARLSON]: It seems like we've found some things intermittently that have helped. We've tried various types of arch supports, which, if I recall, seemed to have helped for a period of time, but, again, nothing that seems to last. * * * She went to the [Oregon] Health Sciences University and got some other types of padding and treatment that helped for a while. Stretching, those types of things, so I think it's kind of come down to those things have helped her, but not cured her."

In 2004, prior to wife's request for spousal support modification, wife was again evaluated by a vocational counselor, Whitman, to assess her employment potential. Whitman was very concerned about wife's level of emotional control and the difficulties she encountered while trying to exchange information with wife. Whitman therefore referred wife to Dr. Clausel for a psychological evaluation. Clausel concluded that wife would

> "likely not have the neurosocial coping [skills] and the intellectual competence to survive in the ordinary adult marketplace. [Wife] may be able to function with a job coach or with a supported employment position, but, in [my] opinion, [she] would absolutely be unemployable without [vocational rehabilitation's] continuing assistance and certainly would be completely unemployable in the short-term, until

> some of the programming [suggested] above has been completed. It is entirely likely that even with external support and extraordinary services, such as job coaching and a supported employment work environment, [wife] would ultimately be unemployable. [An assessment is necessary] across the next 12-24 months to see if she benefits from programming efforts; if not, she certainly should be referred for [a] disability application."

Based on Clausel's evaluation, Whitman ultimately closed wife's case as too severe for rehabilitation.

After receiving all testimony, the trial court made detailed written findings regarding wife's education, health, and employability status from the time of dissolution to modification. Based on credibility determinations of wife, Clausel, Carlson, and Whitman, the trial court agreed that wife was, "for all intents and purposes, currently unemployable."

> "[H]er limited education and cognitive abilities, combined with her inability to deal emotionally with competitive pressure in a workplace environment, and her physical inability to stand and work at a manual labor job for any extended period of time, make her future prospects uncertain at best."

> "* * * * *

> "From the testimony of the witnesses, the evidence presented, and having observed [wife's] demeanor in the courtroom, *I simply do not find that she is employable now*. The only type of work which she is qualified for, by education and experience, is minimum wage, repetitive-type labor, such as working in a 'production-line' at a cannery, which she did, in fact, do for a period during marriage. *With her foot problems, however, she cannot even do that now*. From the credible testimony of Dr. * * * [Clausel] and * * * [vocational counselor] Whitman, I must conclude that her cognitive and emotional limitations prevent her from working in any type of pressured retail or business environment. *This will probably only get worse over time*. From observing her in court, it appears that she would like to be able to work, but that, despite her best efforts, she simply can't."

(Emphasis added.)

In addition to finding Carlson's testimony credible, the trial court also concluded that the parties were not aware of the "full extent of the effects of the [plantar fasciitis] on [wife's] ability to stand for long periods of time * * *." Although wife

"was generally aware of the possibility of foot problems and experienced some foot pain prior to the * * * divorce, she did not seek treatment for the condition until 1997 when, after first consulting with a doctor in Heppner, she was referred to Dr. Carlson, who diagnosed her condition."

Based on the evidence presented above, the trial court granted wife's request for indefinite spousal support of $1,000 a month.

On appeal, husband argues that wife's circumstances in her education, employment, and health are not substantially different now from what they were in 1995; that any change is due to the aging process, which was anticipated at the time of the dissolution. Husband further argues that there is no evidence in the 1995 judgment of dissolution to support the trial court's conclusion that the parties contemplated that wife would be fully employable at the end of the 10-year period. Thus, he asserts, the trial court erred in granting wife's request for indefinite spousal support. For the reasons discussed below, however, we disagree and affirm the trial court's decision.

■ A modification of spousal support must be based on a substantial and unanticipated change in circumstances since the entry of judgment. ORS 107.135; *Tomos*, 165 Or App at 87. The party requesting the modification bears the burden of proving the change in circumstances, *Vandenberg*, 186 Or App at 597, and "[a] substantial deterioration in health may constitute changed circumstances, as could * * * a failure to improve, if significant improvement was contemplated at the time of the original judgment." *Polette and Polette*, 99 Or App 327, 781 P2d 1253 (1989), *rev den*, 309 Or 291 (1990). Such a substantial deterioration does not require proof that a person is "literally unable to perform physical labor or manage desk work in order for * * * health problems to amount to a substantial change in circumstances." *Tomos*, 165 Or App at 88; *see also Fellows and Fellows*, 124 Or App 476, 478, 862 P2d

1325 (1993) (upholding indefinite grant of spousal support based on preexisiting osteoporosis that became unexpectedly severe, a lack of evidence that the condition would improve, increased expenses for medication, and a doubt in the wife's ability to continue working). *But cf. Barron and Barron,* 85 Or App 278, 282-83, 736 P2d 583 (1987) (wife failed to show change in circumstances where record did not support trial court's findings that parties at the time of dissolution contemplated an improvement in health).

■      Initially, we agree with husband that wife's level of education has not changed in the past 10 years. During the marriage and after the dissolution, wife attempted to obtain her GED, but, at the time of the modification, still was not successful. Additionally, both the 1994 and 2004 vocational assessments confirm that wife's reading, math, and vocabulary aptitudes remained at approximately a sixth-grade level.

However, despite the static nature of her educational aptitude, wife's employment status and prospects have changed substantially, due to her plantar fasciitis. Although the stipulated judgment of dissolution had no stated purpose for the spousal support, we assume that the judgment was based on all evidence available to the parties at that time. The record reflects that the 1994 vocational assessment anticipated that wife would work within approximately two years: one year to complete her GED and one year for vocational training. Based on that evidence, we agree with the trial court that wife presented substantial and credible evidence that, at the time of dissolution, it was contemplated that she would be self-supporting and was, in fact, employed, despite her cognitive and emotional disabilities.

Even with her limited work history, just prior to the dissolution in 1994, wife's vocational consultant listed several jobs that she was qualified to perform. Also, her projected income showed that wife had earning potential; she, in fact, worked for most of the 10 years between dissolution and her request for modification. Comparing the 1994 assessment to Clausel's assessment in 2004, wife's employability had shifted from being employable and capable of earning

some income to support herself to being "simply" unemployable. The overall evidence establishes that wife is currently unemployable and, "in a worse condition than she was at the time of dissolution." *Vandenberg*, 186 Or App at 598.

Additionally, wife's employability is further diminished by her plantar fasciitis. Although wife had foot pain prior to the dissolution, the pain did not "manifest[ ] itself in ways before the divorce that were essentially the same as * * * [those] that occurred after the divorce." *Vandenberg*, 186 Or App at 598. Wife was generally aware of problems with her foot; however, the severity of her true condition to the extent that it hindered her employment was not obvious until after her diagnosis for plantar fasciitis in 1997. The record supports the trial court's finding that, between dissolution and modification, wife's plantar fasciitis negatively affected her employability.

Husband argues that wife has the ability to maintain recreational activities; thus, she can find gainful employment. However, wife need not be "literally unable to perform physical labor or manage desk work," *Tomos*, 165 Or App at 88, to demonstrate a substantial deterioration of health. We, like the trial court, reject husband's argument.

Regarding wife's status as unemployable, we agree with the trial court that wife's myriad of employment and educational barriers, plus her physical health problems, have adversely affected her employability and will only get "worse over time." The record supports the trial court's conclusion that, in 1994, the parties believed that wife would be self-supporting after 10 years; wife was already employed at that time, she had the potential for future employment according to the 1994 assessment, and she continued working through most of the 10 years. The worsening of wife's foot condition caused a substantial deterioration of her health. The record before us supports the trial court's findings that wife has shown a substantial and unanticipated change in circumstances due to a deterioration in health, causing her to be unemployable. Therefore, we affirm the modification of spousal support to indefinite status of $1,000 a month.

Affirmed.